# ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
PAW & Associates, LLC ) ASBCA No. 58534
)
Under Contract No. W9133L-08-D-0010 )

APPEARANCE FOR THE APPELLANT: Mr. Paul A. Weaver, Jr.
President & CEO

APPEARANCES FOR THE GOVERNMENT: Raymond M. Saunders, Esq.
Army Chief Trial Attorney
CPT Ahsan M. Nasar, JA
Brian E. Bentley, Esq.
Trial Attorneys

## OPINION BY ADMINISTRATIVE JUDGE JAMES

The captioned appeal arose from the contracting officer's (CO's) 9 November 2012 decision denying the 5 October 2012 claim of PAW & Associates, LLC (PAW). PAW's claim alleged that the government (i) did not fairly and honestly evaluate PAW's April 2012 task order proposal; (ii) did not award PAW a task order under the captioned contract, and (iii) improperly divulged to PAW's competitors proprietary information contained in PAW's proposal. The Board has jurisdiction of the appeal under the Contract Disputes Act of 1978, 41 U.S.C. §§ 7101-7109. In July 2013 the government moved for summary judgment on issue (ii), and to dismiss issues (i) and (iii) for lack of subject matter jurisdiction. Our 22 November 2013 decision granted summary judgment to the government on issue (ii) and denied its motion on issues (i) and (iii). *PAW & Associates, LLC*, ASBCA No. 58534, 13 BCA ¶ 35,462 at 173,908. After a 2½ day hearing at the Board, the parties submitted post-hearing and reply briefs on issues (i) and (iii). The Board is to decide both entitlement and quantum (tr. 1/10).

## FINDINGS OF FACT

1. Mr. Paul A. Weaver, Jr., is the president, CEO and sole employee of PAW (tr. 2/149-51). Mr. David J. Lynch, Jr., is the president of Drake Oversight Project Services, LLC (Drake), and has 30 years experience in government contracting, some of which was as a CO (tr. 1/25, 50, 137, 146, 161-62, 165, 204).

2. Effective 22 April 2008 the U.S. Army National Guard Bureau (NGB) CO Christine Pettigrew awarded multiple award, indefinite delivery, indefinite

quantity (IDIQ) Contract No. W9133L-08-D-0010 (the contract) to PAW for subject matter expert support services (R4, tab 1 at 1-2, 16, 28). CO Pettigrew also awarded contracts for subject matter expert support services to two other contractors. *PAW & Associates,* 13 BCA ¶ 35,462 at 173,906, SOF ¶ 17 n.2.

3. Contract section B, Supplies or Services and Prices, provided for a performance period of a base year and four one-year options. Each such period had three contract line item numbers (CLINs). The base year included CLIN 0001, Subject Matter Expert support; CLIN 0002, Other Direct Cost/Travel; and CLIN 0003, Contingency Plan/Overtime Cost. The four options each included three CLINs for those three services. (R4, tab 1 at 2-9)

4. Contract section F, Deliveries or Performance, specified the following periods of performance (POP) for the base and option years:

| Year | POP From-To | CLINs |
|------|-------------|-------|
| Base Year | 22 APR 2008 to 21 APR 2009 | All |
| Option 1 | 22 APR 2009 to 21 APR 2010 | All |
| Option 2 | 22 APR 2010 to 21 MAR 2011 | 2001 |
| "    " | 22 APR 2010 to 21 APR 2011 | 2002/2003 |
| Option 3 | 22 APR 2011 to 21 APR 2012 | All |
| Option 4 | 22 APR 2012 to 21 APR 2013 | All |

(R4, tab 1 at 20-21)

5. Contract clause H-10, Exercise of Options, provided:

> [T]he Government may elect to extend the term of the contract by exercising its unilateral right to do so. When exercising such right pursuant to clause 52.217-9, an Option to Extend the Term of the Contract (MAR 2000), the Government will exercise the options as identified in the schedule "Section B".

(R4, tab 1 at 27)

6. The contract included the: (a) FAR 52.212-4, CONTRACT TERMS AND CONDITIONS—COMMERCIAL ITEMS (FEB 2007) clause, which provided in pertinent part:

> (d) Disputes. This contract is subject to the Contract Disputes Act of 1978, as amended [CDA, now

41 U.S.C. §§ 7101-7109]. Failure of the parties to this contract to reach agreement on any request for equitable adjustment, claim, appeal or action arising under or relating to this contract shall be a dispute to be resolved in accordance with the clause at FAR 52.233-1, Disputes, which is incorporated herein by reference.

and (b) FAR 52.216-18, ORDERING (OCT 1995) clauses in section H-13 and in section I that were identical, except for the last phrase in ¶ (a), which provided:

> (a) Any supplies and services to be furnished under this contract shall be ordered by issuance of task orders by the individuals or activities designated in the contract. Such orders may be issued from *date of contract award though expiration of the contract.* [The italicized phrase is in the section H-13 version. The section I version stated: **Date of Award through 21 April 2013**].

7. Since the fourth option expired on 21 April 2013 (finding 4), we find that these Ordering clauses were consistent. The contract did not set forth procedures for the government to provide fair opportunity to contractors to compete for task order awards or expressly require the government to safeguard proprietary contractor information.

8. The contract included the FAR 52.217-9, OPTION TO EXTEND THE TERM OF THE CONTRACT (MAR 2000) clause, which provided in pertinent part:

> (a) The Government may extend the term of this contract by written notice to the Contractor within 30 days; provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least 60 days before the contract expires. The preliminary notice does not commit the Government to an extension.

The contract included no Rights in Data clause prescribed by FAR 27.409. (R4, tab 1 at 28-41)

9. Effective 1 October 2008, bilateral contract Modification No. P00003 (Mod. 3), signed by "David Lynch FOR PAUL WEAVER" on 29 August 2008 and by CO Pettigrew on 2 September 2008, stated that the government exercised its first option year for CLINs 1001, 1002 and 1003. Mod. 3 "extend[ed] the terms of the contract for the period of 1 October 2008 through 30 September 2009" and

changed the Delivery Schedule for CLINs 1001-1003 "from [sic]...POP 01-OCT-2008 TO 30-SEP-2009." (R4, tab 4 at 1-4; ex. A-51 at 1-2; tr. 3/34-36)

10. Effective 16 July 2009, unilateral contract Modification No. P00004 (Mod. 4), signed by CO LTC James A. Helm on 31 August 2009, exercised option year 2, CLINs 2001, 2002 and 2003, by which the "Government hereby...extend[s] the terms of the contract for the period of 1 October 2009 through 30 September 2010" (R4, tab 5 at 1-2, 6; ex. A-52).

11. Effective 19 August 2010, bilateral contract Modification No. P00006 (Mod. 6), signed by "David Lynch FOR P. WEAVER" on 23 August 2010 and by CO Pettigrew on 1 September 2010, exercised option year 3 "for CLIN[s] 3001, 3002 and 3003" for "POP 01-OCT-2010 TO 30-SEP-2011" (R4, tab 7 at 1-3, 5; ex. A-53 at 1).

12. On 30 September 2010, the last day of option year 2 as amended by Mod. 4 (finding 10), NGB issued contract Task Order No. 0011 (TO 11) to PAW, apparently non-competitively (tr. 1/202; R4, tab 9 at 1). TO 11's section B included PAW's 27 September 2010 Performance Plan for Domestic Social, Technical, Environmental, Economic and Political (D-STEEP) Research which plan included the following restrictive legend set forth in FAR 15.609(a) for unsolicited proposals:

Use and Disclosure of Data

This proposal includes data that shall not be disclosed outside the Government and shall not be duplicated, used, or disclosed – in whole or in part – for any purpose other than to evaluate this proposal. However, if a contract is awarded to this Offeror as a result of – or in connection with – the submission of these data, the Government shall have the right to duplicate, use, or disclose the data to the extent provided in the resulting contract. This restriction does not limit the Government's right to use information contained in these data if they are obtained from another source without restriction. The data subject to this restriction are contained in Sheets 1 to 33.

NGB added CLINs 3002 and 3004 to the Performance Plan and set forth POP "30-SEP-2010 TO 30-APR-2011" for them. (R4, tab 9 at 33-34, 36; ex. A-4 at 1)

13. PAW's 11 October 2010 "Research Plan Domestic Social Trends" submitted under TO 11 on the 11th day of option year 3 as amended by Mod. 6 (finding 11), addressed five STEEP perspectives in the 2015-2020 timeframe and used

4

the term "Key Past Results Indicators" without a restrictive or proprietary legend (ex. A-9 at 1, 3, 5-6).

14. PAW's 10 December 2010 and 11 April 2011 monthly status reports under TO 11 included the term "Catalyst®" with no restrictive or proprietary legend (ex. A-11 at 3, ex. A-12 at 3).

15. On 9 September 2011 NGB requested PAW to submit a detailed technical proposal for research and analysis to forecast projected D-STEEP issues (ex. A-34 at 2). PAW's 22 September 2011 email and letter to NGB sent a 23 September 2011 proposal titled, "Performance Plan for National Guard Future Missions and Mission Sets (Research Plan Preparation)," including the same restrictive legend as it submitted on 27 September 2010 except for the final words "Sheets 1 to 7" (ex. A-41 at 5).

16. After a competition among IDIQ contract awardees (tr. 1/201-02, 2/32), NGB CO, MAJ Nicole Clark, issued Task Order No. 0014 (TO 14) to PAW on 30 September 2011, the last day in option year 3 as amended in Mod. 6 (finding 11), for five research plans to "be used to examine conditions which would affect the decisions of the National Guard Senior Leadership relative to future missions" with delivery 90 days after TO 14 was issued (R4, tab 11 at 1, 3-4).

17. PAW submitted to NGB under TO 14 a 217-page Research Plan dated 19 October 2011, that used the terms "STEEP" and "key indicator/driver" with no restrictive legend (R4, tab 31). Ms. Phyllis Brantley, NGB's Chief of Diversity and Special Emphasis Programs, received PAW's Research Plan on 3 October 2011, the third day of option year 3 as amended (finding 9), and accepted it on 19 October 2011 "as a final deliverable" (ex. A-44).

18. Mr. Lynch's 29 March 2012 email to Ms. Brantley sent an "Estimated Basis of Estimate" of Drake Project Oversight Services for a six-month research effort for $697,879.18 and a three-month option for $353,991.40 (amounts based on proposed hours and rates), and included a restrictive legend the same as that sent on 27 September 2010 (finding 12) except for the concluding words "Sheets 1 to 3" (R4, tab 12 at 1-6). Mr. Lynch's 30 March 2012 email to Ms. Brantley attached a "PERFORMANCE WORK STATEMENT [PWS] National Guard Bureau Future Missions and Mission Sets Follow-on Contract" that stated: "Preparing Organization: National Guard Bureau" and which included no restrictive legend. The PWS provided, *inter alia*: "The research conducted by the [contractor] follows the research plans [delivered under TO 14]…for the investigation into conditions existing within the period 2022-2027 for which the National Guard Senior Leadership must begin planning to contend with and (or) capitalize upon." (R4, tab 12 at 7-8, 10, 12 ¶ 5.1.1.1; tr. 1/88)

19. NGB CO Lisa Loverde's 17 April 2012 email to PAW requested a technical and price proposal for a "STEEP Task Order," attached Drake's performance work statement and stated: "I have Drake's proposal but I can't accept a proposal with their letterhead because our contract will be with PAW. Please reformat and present as a PAW document." (R4, tab 16 at 1) That proposal was to be under PAW's IDIQ contract on a non-competitive basis (tr. 2/32-34).

20. On 18 April 2012 Paul Weaver and David Lynch signed a "TEAMING AGREEMENT" to submit and pursue an order under Contract No. W9133L-08-D-0010 to perform "the Research and Analysis phases of DRAKE's process for forecasting future recruitment and training requirements for the NGB." This agreement provided, *inter alia*, that if PAW were issued an order, it would renegotiate a subcontract with Drake, that PAW would function as the "Prime Contractor" and would "identify Drake as a subcontractor." (Bd. order of 2 February 2015; PAW's 2 January 2015 ltr. No. 001-2015, encl. D-3, attach. B at 1) The appeal record includes no PAW-Drake subcontract.

21. Effective 19 April 2012, bilateral contract Modification No. P00008 (Mod. 8), signed by "David Lynch FOR P. WEAVER" and by CO Christine Pettigrew respectively on 19 and 20 April 2012, stated: "The Government hereby exercise[s] it[s] unilateral rights to extend the terms of the contract for the period of 22 APRIL 2012 through 21 APR[IL] 2013" for option year 4 CLINs 4001-4003 (R4, tab 17 at 1-2, 5).

22. On 24 April 2012 PAW sent CO Loverde a proposed "STEEP Follow-on" task order on PAW's letterhead pursuant to her 17 April 2012 request. The proposal cited "Solicitation No. W9133L-R-11-00XX" and "Task Order No. W9133L-08-D-0010/XXX" and contained a restrictive legend the same as that sent on 27 September 2010 (finding 12), except for the concluding words "Sheets 1 to 30" (R4, tab 18 at 1-2, 4). According to Mr. Lynch, Drake owns allegedly proprietary information and trade secrets in PAW's 24 April 2012 proposal to NGB (tr. 1/146-47).

23. On 10 May 2012 NGB advised Drake and PAW concerning the STEEP project that the procurement was on hold until the program office had time to develop its requirements more fully (R4, tab 23 at 1). On that same date NGB formed a "Tiger Team" of experts in diversity and data bases to review and evaluate PAW's STEEP proposal and deliverables (tr. 2/116-17).

24. After Mr. Lynch expressed concern to Brig. Gen. (BG) William R. Burks, Chairman of NGB's Joint Diversity Executive Council on 28 May 2012 about NGB's "on-hold" of his STEEP task order proposal, BG Burks told Mr. Lynch, "[t]he deliverables are the issue." On 28 May 2012 Mr. Lynch sent BG Burks a statement of deliverables for "Catalyst Maps," "Research DATA," "Integrated Catalyst Map" and "Refined Research Data," which contained no restrictive legend. (Ex. A-87, ¶ 8,

6

ex. A-89 at 1-5) BG Burks forwarded those deliverables to Ms. Brantley and others on 29 and 31 May 2012, without identifying their source, without substantive changes and without any restrictive legend with respect to STEEP and "Catalyst Maps" (ex. A-29 at 1-3, ex. A-87, ¶ 11, exs. A-90 to A-92 at 10, 16, 27, 34-41, ex. A-97; tr. 2/120).

25. From May through August 2012 NGB reviewed PAW's 24 April 2012 proposal with respect to the proposed database accessible to the 50 state National Guard Adjutant Generals, the lack of specified deliverables, and whether NGB had the in-house capability to perform any of the proposed tasks (exs. A-62, -64, -68, -71 to -73, -89 at 1; tr. 1/95-96, 2/19, 24, 36, 43, 75-78).

26. On 17 July 2012 Ms. Brantley recommended to CO Clark to cancel the STEEP requirement because much of its proposed information was in military data bases (ex. A-68 at 1, 5-6).

27. CO Clark's 28 August 2012 email to Paul Weaver stated:

> During the latest research we were performing on contract W9133L-08-D-0010, in order to issue a task order for the STEEP requirement that the NGB EO/Diversity office is currently trying to pursue, we just recently discovered this contract is no longer valid. It appears Option Year Four was exercised after the period of performance had expired. Option Year Three carried the contract through September 30, 2011, but Option Year Four was not exercised until April 22, 2012, long after the contract had ended. Therefore, there was a gap of almost seven months from October 1, 2011 until April 21, 2012.
>
> Due to this finding, we do not believe W9133L-08-D-0010 can be used. At this point in time, we believe our only option would be to compete the requirement, and unfortunately there is not enough time within the fiscal year to accomplish this action.
>
> If you have other contracting vehicles that NGB might be able to use to accomplish this requirement within FY12, we would be happy to meet with you in person to discuss this matter further.

(R4, tab 24 at 3)

28. On 5 September 2012 CO Loverde notified Mr. Weaver that NGB was requesting proposals for "STEEP Solicitation," No. "W9133L-12-C-0147" (sic) and directed him to FedBizOpps to view the opportunity (R4, tab 26). Solicitation No. W9133L-12-C-0147, posted 4 September 2012, was based on information provided by Ms. Brantley and on PAW's task orders 11 and 14 deliverables (R4, tabs 14, 15; ex, A-91; tr. 2/10-12, 21-22), and set forth, *inter alia*, the following "Program Objectives":

> 1. STEEP Report – Conduct research analysis in accordance with the plans previously produced, submitted and accepted under Task Order W9133L-08-D-0010-0014. The analysis shall concentrate on identifying those circumstances impacting the past and current states of multiple subtopics within each particular STEEP Perspective (i.e., Social, Technical, Environmental, Economic, and Political)....
>
>     ....
>
> 5. Catalyst Maps – Provide catalyst maps to record "raw" Key Indicators. The Contractor shall provide one (1) catalyst "map" for each of the five (5) STEEP Perspectives. The maps shall reflect the direction, scope, and volume of the research analysis; from Topic through associated Circumstance(s).

(R4, tab 25 at 4) According to Mr. Lynch, the underscored sentences contained Drake's proprietary information (tr. 1/150-51). On 4 September 2012 Tom Pafford, CEO of The World's Technology, asked CO Loverde to provide the STEEP Report and Catalyst Maps mentioned in the foregoing STEEP Solicitation (ex. A-98 at 1).

29. On 7 September 2012 that solicitation was cancelled "[d]ue to time constraints" (R4, tab 27 at 1).

30. On 5 October 2012 PAW submitted a certified $718,498.46 CDA claim to NGB. As presently pertinent, PAW alleged that NGB denied PAW "a fair and honest evaluation" of its 24 April 2012 task order proposal and that NGB's 5 September 2012 STEEP solicitation improperly released PAW's proprietary information for purposes other than the evaluation of PAW's approach. (R4, tab 29 at 1-2, 10) Although Drake prepared the disputed proposal and discussed the TO with NGB (findings 18-19, 23-24), PAW's claimed costs are all designated "PAW" without any mention of Drake (R4, tab 29 at 10).

8

31. Mr. Lynch is not aware of anyone or any company that is using Drake's allegedly proprietary approach of Mindset Catalyst and STEEP perspectives outlined in PAW's 24 April 2012 proposal (tr. 1/158, 197-98).

32. The 9 November 2012 final decision of CO Helms denied PAW's claim in its entirety and notified PAW of its appeal rights (R4, tab 30 at 1, 6-7). PAW timely appealed from that decision on 1 February 2013.

33. "Catalyst®" is the registered mark of Mindjet company (tr. 3/8, 11), the term "STEEP" has been posted on a public blog since 2008 (tr. 3/13), Michael Deutch of Mindjet "came up with the idea of using Mindjet with a STEEP-like analysis" in 2008 and he promoted this process in "Twitter, LinkedIn, Facebook" and newsletters thereafter "to several hundred thousand people on a monthly basis" (tr. 3/13-14).

## DECISION

This appeal presents two legal questions. First, did NGB breach the contract by failing to accord PAW a fair and honest evaluation of its 24 April 2012 task order proposal? Second, did NGB's 5 September 2012 solicitation breach NGB's obligation to safeguard PAW's allegedly proprietary information from disclosure to parties other than PAW or Drake?

I.

As of 22 April 2008: 10 U.S.C. § 2304a provided in pertinent part that an agency head may exercise the authority provided by § 2304 to "award separate task or delivery order contracts for the same or similar services or property to two or more sources." 10 U.S.C. § 2304b provided in pertinent part:

> (e) Multiple awards.
>
> (1) The head of an agency may, on the basis of one solicitation, award separate task order contracts under this section for the same or similar services to two or more sources if the solicitation states that the head of the agency has the option to do so.

10 U.S.C. § 2304c provided in pertinent part:

> (b) Multiple award contracts. When multiple task or delivery order contracts are awarded under section 2304a(d)(1)(B) or 2304b(e) of this title, all contractors

awarded such contracts shall be provided a fair opportunity to be considered, pursuant to procedures set forth in the contracts, for each task or delivery order in excess of $2,500 that is to be issued under any of the contracts unless --

....

(3) the task order or delivery order should be issued on a sole-source basis in the interest of economy and efficiency because it is a logical follow-on to a task or delivery order already issued on a competitive basis....

and to implement the foregoing statutes, FAR 16.505(b) provided:

(b) *Orders under multiple award contracts—* (1) *Fair opportunity.* (i) The [CO] must provide each awardee a fair opportunity to be considered for each order exceeding $3,000 issued under...multiple task-order contracts, except as provided for in paragraph (b)(2) of this section.

(ii) The [CO] may exercise broad discretion in developing appropriate order placement procedures. The [CO] should keep submission requirements to a minimum. [COs] may use streamlined procedures, including oral presentations. In addition, the [CO] need not contact each of the multiple awardees...before selecting an order awardee if the [CO] has information available to ensure that each awardee is provided a fair opportunity to be considered for each order....

....

(2) *Exceptions to the fair opportunity process.* The [CO] shall give every awardee a fair opportunity to be considered for a delivery-order or task-order exceeding $3,000 unless one of the following statutory exceptions applies:

....

10

(iii) The order must be issued on a sole-source basis in the interest of economy and efficiency because it is a logical follow-on to an order already issued under the contract, provided that all awardees were given a fair opportunity to be considered for the original order.

FAC 2005-13, 28 September 2006, Item IV, increased the FAR 2.101 "micro-purchase threshold" from $2,500 to $3,000 pursuant to § 807 of Pub. L. No. 108-375, the National Defense Authorization Act for Fiscal Year 2005, and hence in FAR 16.505(b).

Contract No. W9133L-08-D-0010 was one of three such IDIQ contracts NGB awarded competitively in April 2008 (finding 2). PAW's 24 April 2012 non-competitive task order proposal was a follow-on task based on its prior STEEP research performed under TO 11, apparently awarded non-competitively, and under TO 14, awarded competitively (findings 12-13, 16-19, 22).

With respect to the statutory "fair opportunity" requirement for a non-competitive task order under a multi-award contract, the FAR requires the CO to use broad discretion to develop appropriate order placement procedures, to minimize contractor submissions and to streamline procedures. FAR 16.505(b)(1)(ii).

Mr. Lynch drafted Drake's proposed Performance Work Statement for a non-competitive task order, which he resubmitted on PAW's letterhead (findings 19, 22). Mr. Lynch identified NGB's concerns about Drake's proposal via NGB's BG Burks and submitted more detailed deliverable requirements to NGB via BG Burks (finding 24). Hence, NGB's 3½-month review of the development of user requirements, specific task order deliverables and NGB's in-house capability to perform the proposed tasks (findings 23-25) was appropriate and reasonable. The record is devoid of evidence that the NGB CO abused his or her discretion with respect to the procedures used to consider and to evaluate PAW's 24 April 2012 task order proposal (findings 23-26).

Moreover, CO Clark's 28 August 2012 statement to PAW: "[T]his contract is no longer valid. It appears Option Year Four was exercised after the [POP] had expired" (finding 27), did not contravene NGB's statutory and regulatory duty to provide PAW's proposal fair consideration.

This is so because of the parties' course of dealing in exercising the contract options. The parties exercised option year 1 bilaterally, extending its POP to 1 October 2008 through 30 September 2009 (finding 9). PAW argues that unilateral Mod. 4 which the CO issued 31 August 2009 to exercise option year 2, did not state that the POP was to be revised (app. br. at 33). PAW admits that Mod. 4 stated that

11

the "Government hereby…extend[s] the terms of the contract for the period of 1 October 2009 through 30 September 2010" (finding 10), and notes the variance of this POP from the POP set forth in the contract (finding 4), but does not dispute Mod. 4's validity. However, it is incumbent on the Board to assure its jurisdiction of the appeal, even if the parties have not raised the issue. *See Bender v. Williamsport Area School District*, 475 U.S. 534, 541, 546-47 (1986).

It is well established that an option must be exercised in exact accordance with the contract terms to be valid, *see Chemical Technology, Inc.*, ASBCA No. 21863, 80-2 BCA ¶ 14,728 at 72,641 (exercise of option varying from specified six months was invalid), and that when a contractor knows of an improperly exercised option, remains silent and performs, it waives its right to protest such exercise. *See E. Walters & Co. v. United States*, 576 F.2d 362, 367-68 (Ct. Cl. 1978).

PAW knew or had good reason to know of the discrepancy between the option year 2 POPs on or about 31 August 2009 (finding10). Thereafter, PAW remained silent, performed TO 11 (issued on 30 September 2010, the last day of option year 2 as changed by Mod. 4) and delivered the TO 11 research plan on 3 October 2010 to NGB (findings 12-13) during option year 3, whose POP had been changed in bilateral Mod. 6 to 1 October 2010 to 30 September 2011 (finding 11). PAW first stated that Mod. 4 was unilateral in its October 2014 brief, inferentially suggesting that it was invalid. Therefore, PAW waived the CO's unilateral exercise of option year 2 in Mod. 4, improperly extending its POP to 1 October 2009 through 30 September 2010 (finding 10). *Walters & Co.*, 576 F.2d at 367-68.

Option year 3 was exercised bilaterally, extending its POP to 1 October 2010 through 30 September 2011 (finding 11) and thereby tacitly conceding PAW's waiver of the option year 2 exercise with its variant POP. Accordingly, the bilateral exercise of option year 4 in Mod. 8 effective 19 April 2012 (finding 21), 6½ months after option year 3's POP had expired, was invalid, as CO Clark correctly found on 28 August 2012 (finding 27). For all the foregoing reasons, we deny PAW's "fair opportunity" claim.

II.

PAW's contract included no provision expressly requiring NGB to safeguard proprietary contractor information (finding 7). As of 22 April 2008, FAR 3.104-1, Definitions, defined "Contractor bid or proposal information" to include "(3) Proprietary information about…techniques marked by the contractor in accordance with applicable law or regulation"; FAR 3.104-4, "Disclosure, protection, and marking of contractor…proposal information…," stated:

(a) Except as specifically provided for in this subsection, no person...may disclose contractor...proposal information...to any person other than a person authorized...by the agency head or the [CO] to receive such information.

....

(e) This section does not restrict or prohibit—

(1) A contractor from disclosing its own...proposal information or the recipient from receiving that information;

(2) The disclosure or receipt of information, not otherwise protected, relating to a Federal agency procurement after it has been canceled by the Federal agency, before contract award, unless the Federal agency plans to resume the procurement.

FAR 15.201(e) provided:

RFIs [requests for information, FAR 15.200(b)] may be used when the Government does not presently intend to award a contract, but wants to obtain price, delivery, other market information, or capabilities for planning purposes. Responses to these notices are not offers and cannot be accepted by the Government to form a binding contract.

and FAR 15.207(b) provided: "Proposals shall be safeguarded from unauthorized disclosure throughout the source selection process.... Information received in response to an RFI shall be safeguarded adequately from unauthorized disclosure."

The government argues that subcontractor Drake, not prime contractor PAW, was the owner of the allegedly proprietary rights (finding 22), so PAW lacks standing to prosecute this claim issue. However, in paragraph 6.4 of "APPELLANT'S REQUEST FOR BOARD CONSIDERATION OF THE PAW-DRAKE TEAMING AGREEMENT" (which was attached to such request), Drake authorized PAW to use its proprietary data in performing the work proposed for the disputed NGB task order (Bd. order, 2 February 2015). Thus, PAW impliedly has sponsored the claim of subcontractor Drake. We hold that PAW has standing to prosecute this claim.

13

There are insurmountable barriers to the viability of PAW's restrictive legends. First, the FAR 3.104-4 duty of agency personnel to protect a contractor's proprietary information, assumes that such information is proprietary, and expressly excludes unprotected information. FAR 3.104-4(e)(2). As shown below, PAW's allegedly proprietary information was not proprietary.

Second, PAW's proposals to NGB dated 27 September 2010, 23 September 2011, 29 March 2012 and 24 April 2012 all included restrictive legends (findings 12, 15, 18, 22). Each such legend was identical to the restrictive legend in FAR 15.609(a), which was limited to unsolicited proposals.[1] Each such proposal was submitted to NGB under PAW's IDIQ contract with respect to a task order. None was submitted as an "unsolicited proposal" or a response to a government RFI, and there was no source-selection process for the noncompetitive task order in issue here. Thus, the regulatory duties prescribed by FAR 15.609 for unsolicited proposals and FAR 15.201(e) and 15.207(b) for safeguarding proposals throughout the source selection process and RFI responses do not apply to PAW's proposals.

Third, although PAW's 2010-2012 proposals to NGB included the terms "STEEP," "Catalyst Map" and "Key indicators" which allegedly were PAW's proprietary data (findings 12, 15, 18, 22), PAW's other correspondence to NGB included those same data without restrictive legends (findings 13, 14, 17, 24). Thus, PAW's repeated disclosures of its allegedly proprietary data without restrictive legends implicitly authorized disclosure of that data to offerors on NGB's STEEP Solicitation No. W9133L-12-C-0147 (finding 28). *See General Atronics Corp.*, ASBCA No. 49196, 02-1 BCA ¶ 31,798 at 157,067 (contractor notified the Navy that it considered its missile launching subsystem to be proprietary, but failed to mark its drawings with the restrictive legend specified by the contract's DFARS 252.227-7013, RIGHTS IN TECHNICAL DATA AND COMPUTER SOFTWARE (OCT 1988) clause, the Navy gained unlimited rights to such drawings); *Bell Helicopter Textron*, ASBCA No. 21192, 85-3 BCA ¶ 18,415 at 92,435 (contractor lost limited rights protection for 21 drawings that it failed to mark with any restrictive legend by considered judgment by responsible company officials, but had such rights to other drawings with restrictive legends); *CompuDyne Corp.*, ASBCA No. 14556, 72-1 BCA ¶ 9218 at 42,773 (absent evidence of an implied agreement of nondisclosure, delivery of data without restrictive legends places such data in the public domain).

Fourth, insofar as PAW claims breach damages from NGB's disclosure of its allegedly proprietary technique or process of using catalyst maps to support a STEEP

---

[1] The FAR 15.609(a) restrictive legend corresponded to that earlier prescribed by FAR 52.215-12, RESTRICTION ON DISCLOSURE AND USE OF DATA (APR 1984) clause, which was not limited to unsolicited proposals, but was deleted from the FAR by FAC 97-2, 30 September 1997, effective 10 October 1997.

14

analysis, such process or technique was conceived and widely promulgated publicly by Michael Deutch of Mindjet in and after 2008 (finding 33). Therefore, such technique or process is not proprietary to PAW or Drake. For the foregoing reasons, we deny PAW's claim on issue (iii) for improper disclosure of its allegedly proprietary data.

## CONCLUSION

We deny the appeal.

Dated: 20 August 2015

DAVID W. JAMES, JR.
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58534, Appeal of PAW & Associates, LLC, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

15